UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| KAREN WEIST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 2:14-cv-00141-LJM-WGH |
| ) | |
| CAROLYN COLVIN, ) | |
| ) | |
| Defendant. ) | |

### ENTRY ON JUDICIAL REVIEW

Plaintiff Karen Weist ("Weist") requests judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), which denied Weist's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423 & 1382c.

Weist argues that the Administrative Law Judge ("ALJ") improperly weighed the medical opinion evidence to determine that Weist does not require an assistive device to ambulate effectively under listing 1.04(C). 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Weist also argues that the ALJ improperly discredited Weist's allegations of pain. The Commissioner denies that the ALJ erred in any way.

### I. BACKGROUND

### A. PROCEDURAL HISTORY

Weist first filed an application for DIB benefits on June 16, 2008, alleging an onset date of June 10, 2008. R. at 147. She also filed an application for SSI benefits on April

20, 2010. R. at 159. The Disability Determination Bureau denied Weist's disability claim on October 8, 2008, R. at 83, and again on December 3, 2008. R. at 88. Weist filed a request for reconsideration by an administrative law judge ("ALJ") on March 5, 2009. R. at 95.

On July 23, 2010, Weist appeared, with her attorney, and testified in a video hearing in Indianapolis, IN, before an ALJ presiding in Falls Church, VA. R. at 31. Also present for the hearing was a vocational expert ("VE"), who also testified. *Id.* On December 20, 2010, the ALJ denied Weist's applications. *Id.* On December 29, 2010, Weist requested review of the ALJ's decision by the Appeals Council, R. at 26, which was denied on May 24, 2011. R. at 1. Weist sought review in the United States District Court for the Southern District of Indiana, which vacated the ALJ's ruling and remanded to the ALJ for further proceedings. R. at 656.

The ALJ held another video hearing on October 30, 2013. R. at 543. Weist appeared and testified in Indianapolis, with her attorney, while the ALJ presided in Alexandria, VA. *Id.* VE Abbe May testified, as well as impartial medical expert, John W. Axline, M.D. ("Dr. Axline"). *Id.* On January 13, 2014, the ALJ again denied Weist's applications. R. at 562. Weist filed her new Complaint with the Court on May 14, 2014. Dkt. No. 1.

### B. AGE, EDUCATION, WORK HISTORY & WEIST'S PERCEPTION OF HER IMPAIRMENTS

Weist was 47 years old at the time of the October 30, 2013, hearing before the ALJ, R. at 594, and had attained her GED. R. at 596.

With respect to her relevant work history, Weist testified that she worked as an order-filler at Wal-Mart from 1997 to 2005, which involved standing, walking, and lifting

2

up to approximately 155 pounds with the help of equipment. R. at 592-93. She also worked for Sodexo Management from 2005-2006 at a bakery, which involved standing, walking, and lifting up to approximately 25 pounds. R. at 592.

At the time of the hearing, Weist testified that she used a cane every day. R. at 597. As to her other assistive devices, she did not use her rolling walker because she had tripped over it on a couple of occasions, and she did not use her motorized wheelchair because it had not worked in about two years and she could not afford to fix it. R. at 597-98.

Weist additionally claimed that she had been diagnosed with fibromyalgia, brain damage from getting hit by a car as a child, which caused frequent headaches, and carpel tunnel in her right hand. R. at 607-09. Weist suggested that her awkward use of her cane at a 2010 doctor's examination, which was discussed by Dr. Axline, resulted from the examining doctor's suggestion that she try using her left hand to operate the cane due to the carpal tunnel in her right hand. R. at 609.

Weist testified that she was not at the time of the hearing prescribed any medication for her back pain. R. at 600. She testified that she sometimes took aspirin for her headaches, but that the aspirin had no effect on her back pain. R. at 605. She claimed that most of the medication and treatments she had tried for her back in the past either did not work or had significant negative side effects, such as short term memory loss. R. at 606-07. She described the pain as "a basketball in my lower right part of my back. It's intense heat. My back feels really tight and tense most of the time so I lean forward to get my back to feel like it's more limber." R. at 601.

Weist lived alone at the time of the hearing and testified that she is able to complete some household tasks, such as laundry, sweeping, making the bed, and basic food preparation, with frequent breaks and other limitations. R. at 602. She explained that her laundry hamper is small, and sometimes she will take an outfit off and take it directly to the washer instead of bothering with the hamper at all. R. at 609. Her estranged husband does all of the exterior household chores, such as the mowing and weed eating. R. at 608. He also makes simple repairs to the house when needed. *Id.*

### C.  RELEVANT MEDICAL EVIDENCE

#### 1.  Treatment Records

Weist first complained of back pain to her then-primary care provider Emily S. Adams, M.D. ("Dr. Adams"), on April 10, 2007. R. at 339. Dr. Adams prescribed Naproxen and ordered x-rays. R. at 339-41. The x-rays, performed the same day, revealed an eighteen-degree lower thoracic dextoscoliosis, 20-degree lumbar levoscoliosis, and that Weist's right leg was nine millimeters longer than her left. R. at 343.

Weist first presented to orthopedic specialist Dr. Mark Stevens, M.D. ("Dr. Stevens"), on April 24, 2007, complaining of lower right sided back pain. R. at 480. She stated that sitting and standing increased her pain. *Id.* Dr. Stevens described Weist's gait and neurological examination as "normal." *Id.* He recognized her scoliosis and ordered more tests and a follow-up appointment. *Id.* Weist presented to Dr. Stevens again on May 24, 2007. R. at 481. She again complained of back pain. *Id.* He again noted that her gait, neurological exam, and strength were "normal" and noted that the tests revealed no obvious spondylolisthesis. *Id.* He stated that she could return to work, but prescribed an MRI and a corset. *Id.*

4

Weist presented to Melissa Willis, N.P. ("Nurse Willis"), on January 29, 2008, for chronic low back pain. R. at 419. Nurse Willis noted Weist's reports of pain, R. at 420, and conducted a physical examination, which described normal lumbar curve, "5/5" muscular strength, and full range of motion. R. at 421. Nurse Willis stated that she did not feel capable of opining on Weist's ability to work after one examination and referred her back to orthopedic specialist, Dr. Stevens. R. at 419.

On February 7, 2008, Dr. Stevens described the results of a June 2007, MRI that Weist received: "facet arthritis at L4-5 and L5-S1 with annular tear at 3-4." R. at 479. He recommended she get a facet block at 3-4. *Id.* On February 14, 2008, Dr. Stevens referred Weist to Dr. Ronald Miller, M.D. ("Dr. Miller"), to perform the cortisone injection in Weist's right lower lumbar facet joint arthropathy. R. at 309. Although the procedure was successful, *id.*, Weist denied that this treatment provided any relief. R. at 354.

Weist presented to Brian Black, D.O. ("Dr. Black"), in May and June 2008. R. at 351. She stated to him that she has "constant and continuous pain" and cannot sit or stand for long period. *Id.* He observed "grossly normal gait" and prescribed Naproxen and Vicodin for her back pain. R. at 352. He recommended a formal consult with Clarian West Spine Group, who he understood performed an MRI in 2007. R. at 352. Dr. Black tried to refer Weist to Dr. Horn, but Dr. Horn denied Weist was a candidate for surgery and refused to see her. R. at 354.

On October 5, 2009, Weist first presented to Troy T. Quiz, M.D. ("Dr. Quiz"), who became Weist's treating physician. R. at 442. On that date, Dr. Quiz prescribed Weist a walker with wheels. R. at 442.

Dr. Quiz referred Weist to G. Joseph Herr, M.D. ("Dr. Herr"), a neurologist, to evaluate Weist's claims of memory loss. R. at 468. His examination noted muscle weakness in the hips and back and joint pain in the low back, shoulders, and hips. R. at 469. Dr. Herr also observed that when Weist held her quad cane with her right hand, she had an exaggerated lean of her body weight onto her right arm and "[w]hen cane switched to left side upon request, same thing on left side." *Id.*

On October 22, 2009, orthopedic specialist Dr. Stevens reiterated that Weist had "chronic back pain," yet "normal" gait and strength. R. at 482. He stated that her straight leg raise was negative, but that the lumbar spine showed "some facet joint arthritis and spondylosis." *Id.* He recounted that he prescribed an epidural steroid injection, which did not help. *Id.* He concluded: "I do not think there is anything else I can do here," and referred Weist to a physiatrist. *Id.*

Upon Dr. Quiz's referral, on December 27, 2009, Weist went to Thomas A. Hawk, M.D. ("Dr. Hawk"), for a pain therapy consultation. R. at 477. Dr. Hawk noted that Weist could perform a straight leg raise without much difficulty and surmised that her pain "appear[ed] to be mainly an arthritic component." *Id.* Dr. Hawk declined to devise a treatment plan until Weist had a lumbar MRI performed. *Id.*

On January 28, 2010, Weist presented to Annette Copeland, N.P. ("Nurse Copeland"), for a wheelchair evaluation. R. at 483. Nurse Copeland found that Weist was unable to ambulate for more than ten feet using her walker without pain and that Weist required assistance dressing herself and preparing meals. *Id.* The report noted that Weist would be unable to use a manual wheelchair due to her past rotator cuff surgery and possible carpal tunnel diagnosis. *Id.* Nurse Copeland's evaluation concluded that Weist

qualified for a powered wheelchair. *Id.* And on March 16, 2010, Shahram Akhavan, M.D. ("Dr. Akhavan"), of Managed Health Services, approved Medicaid funding for a powered wheelchair, which had been initially denied. R. at 495.

Dr. Quiz also referred Weist to podiatrist Iriwin Malament, D.P.M. ("Dr. Malament"), to have an orthotic insert fit to help remedy the nine millimeter difference in the length of Weist's legs. R. at 497. On May 17, 2010, Weist presented to Dr. Malament, who opined that Weist required the use of an assistive device while standing or walking. R. at 501. Dr. Malament's report also concluded that Weist could not walk a city block without rest or severe pain and was incapable of work. R. at 500.

## 2. Social Security Administration Consultative Exams

On July 25, 2008, Weist presented to James P. Nicolai, M.D. ("Dr. Nicolai"), a state medical consultant. R. at 376-82. Weist reported lower back pain when she stands, sits, or walks for long periods. R. at 376. Dr. Nicolai observed: "normal posture; gait is slowed, broad based, and antalgic . . . . She looks like she could use an assistive device." R. at 381. He additionally concluded regarding Weist's RFC: "The Claimant seems unable to stand/walk for at least 2 hours in an 8 hour day due to her low back pain." *Id.*

On July 28, 2008, J. Sands M.D. ("Dr. Sands"), a reviewing state medical consultant, reversed Dr. Nicolai's conclusion that Weist was "unable to stand/walk for at least 2 hours in an 8 hour day due to back pain" because it "is not supported by clinical evidence." R. at 390.

Weist presented to Bilal Sadafi, M.D. ("Dr. Sadafi"), a state medical consultant, on March 5, 2011. R. at 848. Weist reported "progressively gradual worsening stabbing, constant lower abdominal pain that is located in her mid to lower back." *Id.* Dr. Sadafi

observed "an antalgic gait with significant favoring of her right lower extremity." R. at 850. He recorded that Weist used a cane as an assistive device and that she stated that she could walk 50 feet or ten minutes. R. at 848. He concluded: "The claimant's symptoms have affected their quality of life and warrant further attention." R. at 850.

### D. VOCATIONAL EXPERT TESTIMONY

The ALJ posed the following hypothetical residual functional capacity ("RFC") to the VE:

> Can you assume an individual of the same age, education and work experience as the claimant. Can you assume that this individual has the capacity to occasionally lift and carry 20 pounds, and to frequently lift and carry 10 pounds. The individual has the capacity for let's say unlimited pushing and pulling up to the capacity for lifting and carrying with the upper extremities, and occasional operation of foot control. The individual has the capacity to occasionally climb stairs and ramps, has the capacity to frequently balance, occasionally stoop, occasionally kneel, occasionally crouch and occasionally crawl. The individual has no limits in reaching, handling, fingering or feeling. The individual has the capacity to understand, remember and carry out simple, routine tasks and in so doing, has the capacity to use common sense understanding to deal with several concrete variables in standardized situations. And is able to do that consistent with the demands of a normal workday schedule. The individual has the capacity to appropriately interact with co-workers, supervisors and the general public. And has the capacity to identify and avoid normal workplace hazards, and to adapt to routine changes in the workplace . . . that the individual does require the ability to change position throughout the workday. That could [be] met at normal breaks and meal periods, or can also be met without leaving the workstation?

R. at 611-13. In response, the VE stated that such an individual could not perform Weist's past relevant work as a bakery worker and order filler, but that there are jobs in significant numbers in the national and Indiana economies that such an individual could perform. R. at 612. The VE then specifically identified examples of such jobs as ticket seller, with 94,000 positions nationally and 4,000 in Indiana; office helper, with 85,000 positions

8

nationally and 880 in Indiana; and counter clerk, with 414,000 positions nationally and 5,500 in Indiana. R. at 613.

In response, the ALJ altered the previous hypothetical as follows:

> [I]f the individual had the capacity to lift and carry 10 pounds occasionally and less than 10 pounds frequently. The individual had the capacity to stand and walk let's say two hours in an eight hour workday, and had the capacity to sit six hours in an eight hour workday. Would there be any jobs available or sustainable under the circumstances?

R. at 613. The VE responded that this individual could also find work in significant numbers in the national and Indiana economies in the following jobs: telephone order clerk, with 208,000 positions nationally and 3,100 in Indiana; charge account clerk, with 196,000 positions nationally and 13,000 in Indiana; and document preparer, with three million positions nationally and 23,000 in Indiana. R. at 613-14.

The VE testified that there are no jobs available to an individual who requires up to two to four additional breaks per workday on a regular but unscheduled basis up to fifteen minutes each. R. at 614. Nor are there jobs available to an individual who is absent from work – or present, but off-task – 20% of the time. R. at 614-15.

### E.  RELEVANT ASPECTS OF THE ALJ'S DECISION

The ALJ was directed by the Appeals Council, pursuant to the District Court's remand order, to reconsider whether or not Weist requires an assistive device to ambulate in formulating Weist's RFC. R. at 543. The District Court specifically pointed the ALJ to reconsider the medical opinions of consultative examiner Dr. Nicolai, treating physician Dr. Quiz, Nurse Copeland, and podiatrist Dr. Malament, all of whom recommended that Weist use an assistive device of some kind to ambulate. R. at 543.

An impartial medical expert, Dr. Axline, was employed to examine the record and opine at the hearing. After a thorough review of the record, Dr. Axline opined that Weist did not require an assistive device. R. at 548. Dr. Axline testified: "It's true that she's been prescribed a cane and a wheelchair and a power – motorized wheelchair. But . . . there's no justification in the record that those are medically prescribed for her ambulation." R. at 580.

Under the Appeals Council's and District Court's directives, and in consideration of new medical source evidence, the ALJ proceeded through the analysis as follows. At Step I, the ALJ determined that Weist met the insured status requirements. R. at 546. At Step II, the ALJ determined that Weist had not engaged in substantial gainful activity since the alleged onset date of June 10, 2008. *Id.* At Step III, the ALJ determined that Weist suffered from the following severe impairments:

> [B]ack dysfunction generally identified as mild degenerative disc disease of the lumbar spine and variously described as mild facet degeneration at L4-S1, mild bilateral foraminal narrowing at L4-L5, small annular tears L3-4 on left, mild lumbar lordosis, degenerative joint diseases, and scoliosis, (2) [sic] leg length discrepancy; and (3) [sic] mental impairment variously described as depression, adjustment disorder with mixed anxiety and depressed mood, and PTSD (20 CFR 404.1520(c) and 416.920(c)).

*Id.* As for Weist's other claimed conditions, including hearing loss, cognitive dysfunction, encephalopathy, attention deficit disorder, anxiety disorder, alcohol dependence, mental retardation, shoulder dysfunction, spinal stenosis, fibromyalgia, chronic obstructive pulmonary disorder, and bipolar disorder, the ALJ found that these conditions were not medically determined and gave specific reasons for those determinations, most commonly that they were not objectively verified by clinical findings in the record. R. at 547-48.

At Step IV, the ALJ determined that Weist's impairment or combination of impairments were insufficient to meet a listing. R. at 548. The ALJ specifically considered listing 1.02, major dysfunction of a joint; and listing 1.04, disorders of the spine. *Id.* An inability to ambulate effectively as evidenced by reliance on an assistive device would satisfy listing 1.04, but the ALJ again found that Weist was not dependent upon an assistive device to ambulate. This determination was based on several pieces of evidence, including: Weist's powered wheelchair stopped functioning six months after delivery and Weist had functioned at home without it for approximately two years since then. *Id.* Dr. Axline testified that the powered wheelchair was not medically necessary, indicating that the decision to prescribe it was based upon "flimsy" evidence. *Id.* Weist testified that she did not use the walker because it caused her to trip and that she had apparently functioned without it at home and ambulated without it in treatment sessions. R. at 549. Although Weist testified that she used a cane consistently, Dr. Axline testified that she was not using the cane in a manner consistent with her impairments. *Id.* This testimony was supported particularly by Dr. Herr, who observed an "exaggerated lean" to whichever side of her body was holding the cane. *Id.*

The ALJ determined that Weist was unable to perform her past relevant work, R. at 560, however, she determined at Step V that Weist had the RFC to perform sedentary work. R. at 550. The physical RFC used follows:

> [T]he claimant has residual functional capacity to occasionally lift and carry 10 pounds and to frequently lift and carry light articles weighing less than 10 pounds. The claimant has the capacity to stand and/or walk 2 hours in an 8-hour workday and has the capacity to sit 6-8 hours in an 8-hour workday. The claimant requires the ability to change position while at work but this can be met at normal breaks and meal periods or without leaving the workstation. The claimant has unlimited ability to push and pull with the upper extremities up to the capacity for lifting and carrying but considering

>the claimant's subjective complaints of leg and back pain, the claimant has the capacity for only occasional operation of foot controls. The claimant has the capacity to frequently balance and occasionally stoop, kneel, crouch, crawl, and climb stairs and ramps. The objective evidence does not support a finding of any limitations in manipulative abilities.

R. at 550. Representative occupations of suitable sedentary work include telephone order clerk, charge account clerk, and document preparer. R. at 561.

In order to formulate this RFC, the ALJ relied considerably on the opinion of Dr. Axline, the non-examining, impartial medical expert, as well as on her assessment of Weist's subjective allegations of pain. As to the latter, the ALJ determined that Weist's medically determined impairments could cause her symptoms, but not to the extent and intensity alleged by Weist. R. at 551. Weist challenges both the ALJ's reliance on Dr. Axline and her discrediting of Weist's allegations of pain.

## II. STANDARD

To be eligible for DIB and SSI, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). To determine whether or not a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

>I.   If the claimant is employed in substantial gainful activity, the claimant is not disabled.
>
>II.  If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.
>
>III. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

  IV. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

  V. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, but then it shifts to the Commissioner at the fifth step. *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

  The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Nelson*, 131 F.3d at 1234.

  The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). *See also*, *Craft*, 539 F.3d at 673. Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must

13

articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. *See also*, *Craft*, 539 F.3d at 673 (stating that not all evidence needs to be mentioned, but the ALJ "must provide an 'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004))). An ALJ's articulation of his analysis enables the Court to "assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review." *Craft*, 539 F.3d at 673.

### III. ANALYSIS

Weist argues that the ALJ improperly weighed the medical opinion evidence to determine that Weist did not require an assistive device to ambulate due to lower back pain. She contends that the ALJ "cherry-picked from the clinical evidence" and failed to give controlling weight to treating and examining sources over non-examining sources, especially Dr. Axline, without due explanation. Dkt. No. 16, at 23-24. Specifically, Weist asserts that Dr. Axline's opinion should be disregarded because he made an improper credibility determination when he assessed Dr. Herr's observation of Weist's use of the cane as "a posture that an actor would use" and as "outright exaggeration or malingering." Dkt. No. 16, at 28-29. Dr. Axline denied making an assessment of Weist as a malingerer, but stated that her behavior suggested that characteristic on that occasion. *Id.* Further, Weist claims that the ALJ failed to provide a "logical and accurate bridge" from Dr. Axline's testimony that Weist could sustain light work without an assistive device to her conclusion that Weist could sustain sedentary work without an assistive device. Dkt. No. 16, at 29. Weist avers that this partial adoption of Dr. Axline's opinion "implicitly recogniz[es] that his conclusions were not supported by the record as a whole." *Id.*

In addition, Weist claims that the ALJ and Dr. Axline were "comparing apples to oranges" by focusing on the severity of her neurological symptoms and muscle strength to evaluate her need for an assistive device instead of on her persistent and well-documented back pain, which she claims was the source of her immobility. Dkt. No. 16, at 25. Weist also argues that the ALJ improperly discounted Dr. Nicolai's opinion that she required an assistive device without explanation. Dkt. No. 16, at 30.

In response, the Commissioner simply states that the ALJ is not necessarily bound to give least deference to a non-examining physician's opinion that is supported by multiple other sources in the record. Dkt. No. 23, at 6. The Commissioner reiterates the ALJ's justifications for her reliance on Dr. Axline's opinion, which merely stated that he "was a qualified specialist who offered opinions only within his specialty." *Id.* Without any citation to evidence in the record, the Commissioner adds that the ALJ concluded that Dr. Axline's opinion was well supported, but reduced the RFC from light to sedentary "based on the medical record and Plaintiff's testimony." *Id.* The Commissioner also points out that the ALJ did not make a finding regarding malingering. *Id.*

Weist also asserts that the ALJ improperly discredited Weist's allegations of pain. Weist cites three inferences drawn by the ALJ that improperly influenced her ruling in this regard: that Weist opinion-shopped, that she received only conservative treatment for her physical and mental complaints, and that her activities of daily living are inconsistent with her alleged limitations. Dkt. No. 16, at 32-33. Weist argues that the ALJ's allegation of opinion-shopping is improper because the ALJ failed to give Weist an opportunity to explain her medical treatment choices at the hearing. Dkt. No. 16, at 33. Weist argues that the allegation of conservative care is contradictory to the allegation of opinion-

shopping, as well as contradictory to the facts in the record indicating that Weist underwent significant and often painful treatment. Dkt. No. 16, at 34. Weist again points out that the ALJ failed to ask her about her medical treatment choices at the hearing. *Id.*

In response to these arguments, the Commissioner addresses the ALJ's reference to "opinion shopping" specifically and simply states:

> It appears that the issue is not the propriety of the inference drawn by the ALJ, but its place in the various reasons given for the ALJ's credibility finding. In determining credibility, the ALJ must consider both the objective medical evidence and the other evidence, including claimant's activities, treatment, precipitating factors, and the like. 20 C.F.R. § 404.1529. In light of the record as a whole, the ALJ was entitled to look at the number of doctors Plaintiff visited and relevant behavior.

Dkt. No. 23, at 7.

With regards to her activities of daily living, Weist argues that activities of daily living are not inconsistent with her disability, and supports her position with the following Seventh Circuit case law: "[t]he critical difference between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as [she] would be by an employer." *Hughes v. Astrue*, 705 F.3d 276, 278-279 (7th Cir. 2013). Dkt. No. 16, at 34-35. The Commissioner makes no additional argument beyond the passage quoted above.

In reply, Weist argues that the Commissioner's cursory treatment of the issues supports Weist's contention that remand is warranted.

The Court agrees with Weist. The Seventh Circuit has "repeatedly [ ] made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir.

2012) (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)).[1] Here, the Commissioner' failed to address substantively many issues raised by Weist and, therefore, her arguments are waived. Although Weist concedes that non-examining sources can be given greater deference than examining sources, the Commissioner failed to demonstrate how application of that rule here would be "well supported" by the record as a whole. Dkt. No. 27 at 2. In fact, the Commissioner's brief made no reference to the record in its argument section and merely reiterated the ALJ's cursory reasoning for reliance on Dr. Axline. Dkt. No. 23, at 6. "Judges are not like pigs, hunting for truffles buried in [the record]." *United States v. Dunkel*, 927 F.3d 955, 956 (7th Cir. 1991). Further, the Commissioner does not mention Weist's argument that Dr. Nicolai's opinion was improperly weighed, nor does she mention the argument that Weist's pain, not her neurological symptoms or muscle strength, caused her immobility. *Id.* Although there may be valid arguments in defense of the ALJ's treatment of the medical record, the Commissioner's "perfunctory and undeveloped" brief does not contain any support, which belies the Commissioner's contention that the ALJ properly weighed the medical opinion evidence.

As to the ALJ's credibility determination, the Commissioner's argument is likewise perfunctory, undeveloped and frankly, confusing. It begins by citing a large section of the ALJ's opinion that discusses opinion shopping, then states that the issue is not of "the propriety of the inferences drawn by the ALJ, but its place in the various reasons given

---

[1] Notably, the Commissioner was aware of this rule because she argues in a footnote that Weist waived any argument with respect to the ALJ's mental RFC determination because she failed to raise it in her brief. Dkt. No. 23 at 2 n.2. The Court now finds that Weist did in fact waive such an argument.

17

for the ALJ's credibility finding." Dkt. No. 23, at 7. The Commissioner concludes: "The ALJ was entitled to look at the number of doctors Plaintiff visited and relevant behavior." *Id.* But, as Weist points out, she never argued that the ALJ was not entitled to look at the number of doctors Weist visited; rather, the issue is, in fact, the propriety of the inferences drawn by the ALJ, which the Commissioner made no attempt to defend. In regard to both the ALJ's allegations of opinion shopping and conservative care, SSR 96-7 states:

> [T[he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from failure to seek or pursue medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.

SSR 96-7. Here, the ALJ failed to question Weist at the hearing about her decisions to seek certain treatment and failed to follow-up, which is contrary to the guideline. In the absence of any support by the Commisioner as to the propriety of the ALJ's inferences regarding opinion shopping, conservative care, and Weist's activities of daily living, the Court must agree with Weist that the ALJ erred in her credibility determination.

This case necessitates a remand for reconsideration by a new ALJ of the medical opinion evidence, specifically as to whether or not the Weist requires an assistive device to ambulate, and of Weist's credibility as it pertains to her persistent allegations of pain.

## IV. **CONCLUSION**

For the reasons stated herein, the Court **REMANDS** this action for further proceedings. The Court will enter judgment accordingly.

IT IS SO ORDERED this 23d day of July, 2015.

                                      LARRY J. McKINNEY, JUDGE
                                      United States District Court
                                      Southern District of Indiana

Distribution:

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com

Thomas B. Browder
KELLER & KELLER
tomb@2keller.com

Timothy E. Burns
KELLER & KELLER
timb@2keller.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov